217 So.2d 813

William G. BRINKS

v.

STATE.

1 Div. 257.

Court of Appeals of Alabama.

Oct. 8, 1968.

Rehearing Denied Nov. 5, 1968.

Frank B. McRight, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and Marlin Mooneyham, Asst. Atty. Gen., for the State.

CATES, Judge.

Charge: robbery; verdict: guilty; punishment: ten years imprisonment. Brinks on being sentenced appealed orally in open court.

### I.

February 16, 1966, two men entered the office of Bear Vending Company on Springhill Avenue in Mobile County. One approached Joseph C. Bear. Presenting a revolver, he said, "This is a stick-up."

We set out part of Mr. Bear's testimony:

"A I went over and I made a remark then that the money has been deposited already, the cash for that day, and if we have got any money, I went over and I opened up the compartment, the locked compartment, and I have been collecting coins for a number of years, and that compartment was full of various types of coins, just loose in various compartments, like quarters, nickels, dimes. I have been saving coins for a number of years. I'm somewhat of a coin collector, and that compartment was really full of coins.

"Q And what did you do with those coins?

"A I just opened it up, and he reached over there and took out some coins, but he didn't take them all out, but he took

some out, and there was one in a bag, and he emptied it out in a little deposit bag, what I call a little cloth bag, a white cloth bag, and dumped some of the coins in it."

At the trial Mr. Bear identified Brinks with emphasis, "Absolutely. I am positive."

The morning of the robbery police officers had shown Mr. Bear some photographs. He testified that he identified Brinks "out of the pictures." Later that same day he picked Brinks out of a police line up.

■ The defense tried to show that one Thomas Wolfe (who at the time of trial) had told two fellow inmates that (a) he, Wolfe, and Bill Waters had robbed Bear; and (b) that Wolfe had said at the time of the robbery that Brinks "was in the motel." This rank hearsay was properly excluded by the trial judge.

This was all that the defense sought to show to counter the tendencies of the State's proof.

### II.

At least five jurors indicated that they were opposed to capital punishment. The record states fifty three (sic) jurors were qualified. The State had fifteen strikes; the defendant twenty-eight. The trial was held June 5, 1967.

Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, decided June 3, 1968, may be held to be retrospective. Spencer v. Beto (July 18, 1968), 5 Cir., 398 F.2d 500, applied *Witherspoon* to a capital conviction had August, 1964.

■ However, here the verdict cured error, if any, under this newly declared doctrine. Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, held that a capital charge which leads to a sentence of life imprisonment is not affected by the question of the scruples of veniremen against electrocution.

## III.

A motion to have the court order a sanity hearing was denied September 21, 1966. The only evidentiary basis to cast suspicion on Brinks's sanity is contained in four letters which are certified in the record over the hand and seal of the circuit clerk. No court reporter's certificate is appended.

Hence, we treat these letters as having been filed and exhibited to the trial judge as backing papers during the argument of the motion.[1] To support our view that their import did not compel a sanity hearing under the statute, we quote:

> "13804 Nebraska Ave.
> Tampa, Fla.
> Sept. 6, 1966

"Dear Sir:

"I, Mary Lou Purser writes in regards to the emotional condition of my son, William Brinks.

"Mr. McRight, Bill has been having trouble since in the 7th grade at Eight Mile School.

"Mrs. Aurita Lyter sent word to me that Bill needed help. I did not have anything done as I had an operation and had a long drawn out recovery.

"Since he has gotten older he still has had trouble.

"He was in trouble while in service and had to spend 6 mos. in solitary confinement.

"His step father (the only dad he knew committed suicide and he gradually acted as he was getting worse from the shock of his step father's death.

"He has been very upset, continuously but I have not been able to get him to see a doctor that specializes in this trouble.

"If there is any way you can get the court to have a test made on him I surely will appreciate it as he needs help. He has for a long time.

"I have come in at times before he went back to Mobile and he would sit and cry and I do know he is really needing help.

"Hoping to hear from you soon,

> "Thank you
> Mrs Tommy Purser
> (Mother)"

\* \* \* \* \* \*

> "Eight Mile School
> Sept. 15, 1966.

"To Whom it May Concern,

"I was William Brinks' teacher for two years in grade six.

"It is my opinion that he was abnormal in many ways. He was a non-conformer, and a bully. He would lie and steal. He was a sex problem in the sixth grade which is abnormal. He could not be trusted any time or any place. He destroyed public property with no concern.

"William had all the symptoms of an 'emotionally disturbed child.'

> "Respectfully,
>
> "(Mrs.) Dora Lambert"
>
> "Mobile Public Schools
> Office of the Principal
> Eight Mile School
> April 15, 1966.

"Mr. Frank B. McRight
Armbrecht, Jackson & DeMouy, Lawyers
P. O. Box 290
Mobile, Alabama 36601

"Dear Mr. McRight:

"This is an estimated evaluation of William Brinks in respect to intelligence and ability as I knew him.

---

1. Lokos v. State, 278 Ala. 586, 179 So.2d 714: "While the letter would possibly not have been admissible on the trial on the merits, we think it could have been considered by the trial judge in arriving at a decision as to whether to invoke the provisions of § 425, Title 15, supra."

"1. His I. Q. was considerably below normal.

"2. He was a failure in all the grades though every method of teaching was used, parent conferences were held and a change from Eight Mile to McGill Inst. was tried.

"3. He stayed in trouble from his first years on.

"4. He seemed to know right from wrong, but seemed to have a compulsion for all types of misbehavior.

"5. He would listen to counseling, make most sacred promises and break them instantaneously.

"6. He was sneaky and deceitful but did not seem to have the intelligence to get away with any of his misdeeds and therefore was constantly in trouble.

"7. He developed early and had an abnormal interest in sex. This was expressed in 'dirty' writing, hunting up lewd pictures and magazines, suggestive language and collecting anything sold that related to sex activity. However, there was never any trouble over an actual sex attempts, other than complaints that he used any opportunity to put his hands on girls who were maturing into adolescence.

"8. His misdeeds here were mainly:

 a. lying

 b. cheating

 c. stealing a car for a ride (not at school)

 d. destruction of public property

 e. failure to cooperate in school rules, etc.

"9. He had no power of concentration and very short spans of interest.

"In summary I would say that William Brinks was below normal in natural intelligence, was a misfit in school, and the parents should have had guidance from his first school days on. His mother wouldn't accept the fact that he was different and therefore he was pushed, prodded and bribed. He had too much attention and material things and had his. mother to shield and help him out of all difficulties. He was not a criminal before the age of fifteen but had many criminal tendencies and I would believe that he would regress as he got older because of his low I. Q.

 "Cordially yours,

 "/s/ Aureta D. Lyter
 "Aurita D. Lyter, Principal
 Eight Mile School"

\* \* \* \* \* \*

"William Brinks was in my seventh grade class, here in Eight Mile School some years ago. I can't say that I taught him anything. He had a penchant for being in trouble all the time. He was both counseled and punished without success. I had occasion to be at the school, out of school hours. I heard shattering glass and investigated. I found William with a hand full of rocks in the act of throwing them through the window panes. The tendencies which he displayed were not those of an average boy of that age.

 "Genevieve Sherman"

 We fail to see a causal connection from Brinks's school years (which are not particularized in time other than by references such as "the seventh grade," "a sex problem in the sixth grade," "not a criminal before the age of fifteen," or from his mother's writing that he was in "trouble" while in service with an averred six months in solitary confinement.

 We believe the due process clause has not been applied to make sanity hearings mandatory. Our Supreme Court in Howard v. State, 278 Ala. 361, 178 So.2d 520, stated:

"\* \* \* the court is under no duty to appoint a lunacy commission or to pro-

cure a report of the Superintendent of the Alabama State Hospital under Tit. 15, § 425, Code 1940. The court has simply the right to seek these aids for advisory purposes when the court, in its discretion, thinks such aids will be helpful. * * *"

This ultima ratio binds us. Code 1940, T. 13, § 95.[2]

Hence, there is no legal validity in a claim of error because of the trial judge's ruling.

### IV.

■ No due process problem arises because of Brinks's being unattended by counsel at the police lineup on February 16, 1966. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

In brief counsel for appellant goes beyond the due process aspect to argue as follows:

"What was the character of the confrontation in the trial below? There were inconsistencies and even contradictions as to how many persons were in the lineup and their various descriptions. Mr. Bear, the only state witness claiming to be able to identify Appellant as the person who robbed him, said that there were only 'three or four' persons in the lineup. Detective Delhomme admitted that there was only one other person of the same height as Appellant in the lineup. Surely, common justice and due process requires there to be some difficulty in the choice for there to be any meaningful identification. Otherwise the lineup becomes so 'unnecessarily suggestive and conducive to irreparable mistaken identification' that an accused's right of due process is denied him. One expert in the field has observed that lineups should have at least seven persons in them, and 'these persons would have to be of approximately the same height, weight, coloration of hair and skin, and bodily types as the suspect.' Murray, 'The Criminal Lineup at Home and Abroad', 1966 Utah L.Rev. 610. Appellant does not say that any lineup not meeting those requirements is a deprivation of one's constitutional rights; he does say that the characteristics of his fell so far short that he should be granted a new trial."

Under a concept of excluding the elements of suggestibility and fading memory which some writers use to cast doubt on the efficacy of identification parades, we point out that both the photographic and lineup identifications were here made on the same day as the robbery. We consider the jury was here the ultimate judge of the identification.

### V.

■ Code 1940, T. 15, § 257, provides:

"§ 257. An indictment must not be quashed, dismissed, discontinued, or abandoned without the permission of the court; and such permission must be entered of record."

This section negatives the notion that an indictment may be discontinued by desuetude.

Appellant argues that he is entitled to a discharge because of his being denied a speedy trial.

On October 5, 1966, an order set trial for October 26, 1966. On February 20, 1967, Brinks filed a motion for speedy trial. On March 3 and May 18, orders set trial for June 5. Trial began June 5, 1967.

■ Whatever may be our speculation as to the ramifications of Justice Foster's language in Ex parte State ex rel. Attorney General, 255 Ala. 443, 52 So.2d 158

---

2. "§ 95. The decisions of the supreme court shall govern the holdings and decisions of the court of appeals, and the decisions and proceedings of such court of appeals shall be subject to the general superintendence and control of the supreme court as provided by section 140 of the Constitution of the state."

(Flummer's case), it is reasonable to conclude that: where a trial judge grants a motion for speedy trial, then the date he sets is prima facie deemed to be the earliest feasible date. Condition of criminal and civil dockets, convenience of defendant, witnesses and attorneys all are factors.

■ Here Brinks did not complain before being put to his jury. There was here no indeterminate putting over as was found in Klopfer v. State of North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1. We find no express or implied failure to prosecute.

### VI.

Appellant's counsel argues that Brinks's conviction was void because there was no arraignment of him by the trial court.

However, in brief, it is conceded that the defendant waived arraignment. This is a rather frequent custom in the Mobile Circuit Court.

The minute entries of the trial court show that Brinks's indictment was filed June 29, 1966; that on July 11, 1966, in open court, he was served with a copy of the indictment; and the cause was set for July 14, 1966, for arraignment. On July 14, 1966, the court examined Brinks in accordance with the requisites of Martin v. State, 277 Ala. 153, 167 So.2d 912.

Having ascertained that Brinks was not represented by counsel and financially unable to employ a lawyer, the judge then and there appointed counsel and reset the date for his arraignment to July 19, 1966. On July 19 the minute entry shows that:

"This day in open court came the State of Alabama by its District Attorney and the defendant in his own proper person and with his attorney, Stephen G. Crawford, and the defendant in open court on this day waived arraignment on the indictment in this case charging him with the offense of Robbery and plead not guilty.

"Thereupon in open court on this day the defendant waived serving of the Jury Venire.

"It is further ordered by the court that the Defendant's oral motion to reduce bond in this case be and the same is hereby denied.

"Thereupon in open court on this day, Defendant's Attorney, Stephen G. Crawford, was in court."

As stated in 22 C.J.S. Criminal Law in the caption of § 406, the object of arraignment "is to establish accused's identity, acquaint him with the charge, and obtain his plea." At § 408, the text indicates that the modern trend is to permit waiver of arraignment and plea. Scruggs v. State, 130 Miss. 49, 93 So. 482.

Thus, in Beaty v. United States, 203 F.2d 652, the Fourth Circuit, per Chief Judge Parker, stated in part:

"* * * it is well settled that arraignment and plea were waived by going to trial. Garland v. State of Washington, 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772; Rulovitch v. United States, 3 Cir., 286 F. 315; Williams v. United States, 6 Cir., 3 F.2d 933; King v. United States, 6 Cir., 25 F.2d 242."

■ Where the defendant appears in open court with counsel and expressly waives arraignment, we can see no harm or denial of due process.

Certainly, after the lawyer has explained the import of the indictment, the ritual of the common law arraignment would seem to serve no purpose. We are not called on here to decide what effect such a waiver would have on the opportunity to demur, move against or plead to the indictment. No doctrine such as sometimes arises on "pleading over" is here brought into play. See McGee, Criminal Procedure in Alabama, "General Nature and Order of Pleas," at page 117.

## VII.

 The prosecution received permission from the trial judge to excuse a detective from the rule of sequestration (or separation) of witnesses during trial. This dispensation is well nigh irrevisably committed to the sound discretion of the trial judge. McElroy, Law of Evidence in Alabama (2d Ed.), § 286.01. Anno. 32 A.L.R. 2d 358.

Also, first, the defense did not object when the State moved to have witness Delhomme excused; second, counsel made no point when the assistant district attorney had the clerk call Mr. Delhomme to the stand. No motion for new trial was filed.

 We find nothing to mark this action as per se prejudicial to the appellant.

## VIII.

After verdict the court reporter's notes show the following colloquy at allocution:

"THE COURT: Gentlemen, is that the verdict of each and every one of you? (The Court polling each juror separately).

"JURORS: Yes, sir.

"THE COURT: Thank you, Gentlemen. Mr. Brinks, stand up, please. (Whereupon, Defendant stood before the Court with his attorney). You have heard the verdict of the jury. Have you anything to say why the sentence of Court should not be passed upon you?

"DEFENDANT: Well, sir, I'd like to say something.

"THE COURT: All right.

"DEFENDANT: I understand what position they were in with the evidence that was before them, and from the testimony, but I'd like them to know that I was innocent. William Waters and Tommy Wolfe robbed the place, and I never went in the place. After all is said and done, it shows you that an innocent man can be convicted. I couldn't get Tommy Wolfe down here to take the stand and testify to that, but that's the way it happened.

"THE COURT: Well, now, Mr. Brinks, let's get something straight here. You asked the Court to subpoena witnesses down here from the prison.

"DEFENDANT: Yes, sir, and—

"THE COURT: And I granted your motion, your request, didn't I? And it was issued, wasn't it?

"DEFENDANT: I just want you to know that I was innocent of the crime.

"THE COURT: All right. The Jury having found you guilty, the Court finds you guilty. Have you anything to say, then, why sentence of Court should not be passed on you? Anything else to say?

"DEFENDANT: No sir. I appreciate all you have done."

Whether Wolfe refused to waive immunity against self-incrimination does not appear. At any event, the court under Code 1940, T. 45, § 61, as amended, ordered a writ to bring one witness from the penitentiary.

 Nothing is made to appear why Brinks did not put Wolfe's name on the list. Compare Magee v. State, 43 Ala.App. 218, 187 So.2d 274.

## CONCLUSION

We have considered the entire record at every point required under Code 1940, T. 15, § 389, i. e., every ruling of the trial judge adverse to the defendant, the organization of the court (S.Ct. Rule 24), the indictment including its caption (Code 1940, T. 15, §§ 229 and 259, No. 95), its charge, conclusion and endorsements, the judgment entry with arraignment, plea, verdict, allocutus, judgment and sentence.

We are at the conclusion that the judgment below is due to be

Affirmed.